UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
─────────────────────────────────────

NEW YORK STATE ELECTRIC &
GAS CORPORATION,

                              Plaintiff,

                              Case # 24-CV-6217-FPG

v.

                              DECISION AND ORDER

COLUMBIA GAS TRANSMISSION, LLC,

                              Defendants.
─────────────────────────────────────

**INTRODUCTION**

Plaintiff New York State Electric & Gas Corporation brings this breach of contract action against Defendant Columbia Gas Transmission, LLC. Defendant moves to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). ECF No. 3. Plaintiff opposes the motion. ECF No. 8. For the reasons that follow, Defendant's motion is DENIED.

**LEGAL STANDARD**

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A court deciding a motion to dismiss pursuant to Rule 12(b)(6) "must accept as true all of the allegations contained in a complaint." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

1

The determination regarding "whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Under this plausibility standard, a complaint must allege "more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678. "[W]ell-pleaded factual allegations" permit a court to "assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. Although Plaintiff's factual allegations set forth in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Id.* at 678. If a plaintiff "ha[s] not nudged [his/her] claims across the line from conceivable to plausible, [his/her] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

## BACKGROUND

According to the complaint, Defendant is in the business of transporting natural gas.[1] ECF No. 1-1 ¶ 1. As part of its business, Defendant takes possession of natural gas purchased by Plaintiff from third parties and transports that gas via pipeline to Plaintiff's designated delivery points, known as Gate Stations, located in the Southern Tier of New York state. *Id.* ¶ 2. At those Gate Stations, natural gas passes through regulators, which reduce its operating pressure. *Id.* The natural gas then flows into Plaintiff's gas distribution system and travels through a network of gas mains and service pipes to reach customers' homes and businesses. *Id.* The business relationship between the two parties is governed by their SST Service Agreement. *Id.* ¶ 27.

Plaintiff alleges that beginning in 2018, Defendant began a large-scale project to inspect the inside of its gas transmission lines in the Southern Tier of New York State. *Id.* ¶ 9. Plaintiff alleges that as part of the inspection, Defendant injected a cleaning fluid containing diesel fuel into

---

[1] Unless otherwise noted, all of the facts in this section are taken from Plaintiff's complaint, ECF No. 1-1.

the pipeline. *Id.* ¶ 10. In June and July 2018, while Defendant's cleaning operations were underway, Plaintiff experienced a series of pressure-related incidents at Gate Stations and in its downstream facilities. *Id.* ¶ 11. These incidents included high-pressure events, whereby operating pressures exceeded the Maximum Allowable Operating Pressure of the gas facilities, and downstream low-pressure events, which caused customer outages. *Id.*

Plaintiff maintains that inspections performed in conjunction with Defendant in June and July of 2018 confirmed that Defendant's cleaning fluid had infiltrated through Gate Stations and into Plaintiff's downstream facilities. *Id.* ¶ 12. Further, Plaintiff maintains that in June and July of 2018, Plaintiff and Defendant removed hundreds of gallons of diesel-filled cleaning fluid that had infiltrated the Gate Stations and migrated into Plaintiff's facilities. *Id.* Plaintiff alleges, on information and belief, that after discovering the contamination, Defendant installed a filter at the inlet of certain Gate Stations to reduce the likelihood of any further contamination from its upstream use of diesel-based cleaning fluid. *Id.* ¶ 15.

On September 18, 2018, Plaintiff issued an invoice to Defendant in the amount of $143,973.34, which Defendant paid. *Id.* ¶ 16. According to Plaintiff, this invoice reflected the costs incurred by Plaintiff for its immediate response to the high- and low-pressure incidents in June and July of 2018, including responding to customer outages, investigating those outages, and relighting customers. *Id.* Plaintiff further alleges upon information and belief that Defendant knew that Plaintiff's invoice was a first installment, and the invoice stated, "INITIAL BILLING FOR POST CREEK AND CHAMBERS DIESEL." *Id.* ¶ 17. At the time the invoice was sent, Plaintiff was still in the process of investigating the extent of the diesel fuel contamination and what to do to rectify it. *Id.*

Plaintiff notified the New York State Department of Public Service ("DPS") of the pressure-related incidents caused by the diesel contamination. *Id.* ¶ 18. Plaintiff and DPS Staff engaged in a series of meetings to discuss the ramifications of the diesel contamination. *Id.* According to Plaintiff, the diesel contamination had damaged—and would degrade—Plaintiff's gas facilities. *Id.* Upon information and belief, Plaintiff alleges that DPS consulted with experts from the United States Department of Transportation's Pipeline and Hazardous Materials Safety Administration ("PHMSA") to determine whether, in PHMSA's opinion, the diesel contamination posed a threat to the integrity of Plaintiff's pipes. *Id.* ¶ 19. Plaintiff alleges that PHMSA confirmed that the chemical effects of the diesel contamination would degrade and soften certain plastic piping within Plaintiff's distribution system and pose pipe integrity issues going forward. *Id.*

As a result, to preserve the integrity, safety, and reliability of its gas distribution system, Plaintiff began a project to replace those portions of its gas distribution system that were affected by the diesel contamination, which required replacement of several miles of mains and services. *Id.* ¶ 20. Plaintiff alleges upon information and belief that Defendant knew that Plaintiff was engaged in this project and would invoice Defendant for the full amount of the damage once the costs were known. *Id.* ¶ 22. On February 17, 2022, Plaintiff issued a Damage Billing Invoice in the amount of $2,257,849.26 to Defendant. *Id.* ¶ 23. Defendant then requested supporting documentation from Plaintiff, which Plaintiff provided. *Id.* ¶ 24. Plaintiff alleges that Defendant has neither rejected, nor paid, the invoice to date. *Id.* ¶ 25.

On March 7, 2024, Plaintiff brought the instant action in New York State Supreme Court, Monroe County. *Id.* at 6. Defendant removed the case to this Court on April 11, 2024. ECF No. 1 at 1. Plaintiff brings one claim for breach of contract against Defendant, alleging that Defendant

breached the SST Service Agreement between the two parties by improperly pushing cleaning fluid, including diesel fuel, into Plaintiff's distribution system. ECF No. 1-1 ¶ 30.

## DISCUSSION

Defendant now moves to dismiss pursuant to Rule 12(b)(6), arguing that Plaintiff has failed to state a claim upon which relief can be granted because (I) the statute of limitations for the claim has expired; (II) the complaint fails to adequately allege a breach of contract; and (III) the complaint fails to allege that Plaintiff has standing to bring this action. ECF No. 3-1. The Court discusses each in turn.

### I. Statute of Limitations

Defendant observes that under New York law, when a claim is merely incidental to another cause of action with a shorter statute of limitations, courts apply the shorter statute of limitations. *Id.* at 8. Defendant argues that in this case, Plaintiff's breach of contract claim is incidental to an underlying claim for injury to property and, as an action to recover damages for injury to property is subject a three-year statute of limitations, this action is untimely. *Id.* at 9. In response, Plaintiff argues that the action is timely under West Virginia law, which governs this action due to a choice of law provision in Defendant's Federal Energy Regulatory Commission Tariff (the "FERC Tariff"). The FERC Tariff is incorporated in the SST Services Agreement between the two parties. ECF No. 8 at 7, 10.

At this time, the Court declines to decide whether the choice of law provision is valid because even assuming that New York law applies, it cannot conclude that dismissal is warranted. At the motion to dismiss stage, the Court must accept Plaintiff's allegations as true. *Iqbal*, 556 at 678. At the time of the relevant events, the parties were engaged in an active business relationship that was governed by a contractual agreement. Among other things, that agreement expressly

5

prohibited Defendant from pushing cleaning fluid, including diesel fuel, into Plaintiff's distribution system. *See* ECF No. 1-1 ¶ 29–30. Even if, as Defendant claims, its alleged misconduct could be framed as a tort, at its core the complaint would appear to "allege[] breaches of an agreement which governed the relationship of the parties and their conduct toward one another." *Marine Midland Bank, N.A. v. Jerry Hamam, Inc.*, 467 N.Y.S.2d 444, 446 (4th Dep't 1983). Therefore, this action would be timely because the six-year statute of limitations for contract claims would apply. *Accord id.* (concluding that, while allegations in answer could be framed as untimely counterclaims for prima facie tort or conversion, they were better understood as a timely claim for breach of contract, since the dispute arose out of the parties' contractual obligations).

Defendant responds that the contract does not govern this dispute because the FERC Tariff limits Defendant's contractual liability to the delivery point. ECF No. 9 at 6–7.[2] Defendant points to two different sections of the FERC Tariff to support its argument. First, it cites to Section 25.5, which reads:

> <u>Objectionable Properties.</u> The gas received and delivered by [Defendant]:
>
> (a) shall be commercially free from dust, gum, gum-forming constituents, paraffin, and other particulates or other solid or liquid matter which might interfere with its merchantability or cause injury to or interference with proper operation of the lines, regulators, meters and other equipment through which it flows at the delivery point.

ECF No. 3-5 at 267–68. Defendant argues that while the FERC Tariff requires the absence of objectional properties in natural gas it delivers to customers like Plaintiff, Section 25.5 qualifies the entire section by limiting liability to a single point, the delivery point. ECF No. 9 at 7. Additionally, it cites to Section 22 of the FERC Tariff, which states:

---

[2] The parties dispute whether this argument was improperly raised for the first time in Defendant's reply. Because Plaintiff was given an opportunity to file a sur-reply, the Court will consider the argument regardless of whether it was properly or improperly raised in the reply.

>    22. POSSESION OF GAS.
>
>    After [Plaintiff] delivers gas or causes gas to be delivered to [Defendant] at the point(s) of receipt specified in the Service Agreement, [Defendant] shall be deemed to be in control and possession of the gas until thermally equivalent quantities (less Retainage) are redelivered to [Plaintiff] or for the account of [Plaintiff] at the point(s) of delivery. Except as specified in the FSS, FSS-M, FBS, ISS and ISS-M Rate Schedules, [Plaintiff] shall have no responsibility with respect to any gas deliverable by [Defendant] or on account of anything which may be done, happen, or arise with respect to such gas until [Defendant] delivers such gas to [Plaintiff] or for the account of [Plaintiff]. [Defendant] shall have no responsibility with respect to such gas before [Plaintiff] delivers or causes such gas to be delivered to [Defendant] or after [Defendant] redelivers such gas to [Plaintiff] or for the account of [Plaintiff], or on account of anything which may be done, happen, or arise with respect to such gas before such delivery or after such redelivery.

*Id.* These sections, Defendant argues, limit its contractual obligations to the delivery point and, thus, any wrongdoing or damages beyond that point could only be recoverable in tort. *Id.*

Plaintiff offers a different interpretation of these provisions. *See* ECF No. 8 at 15; ECF No. 15 at 4. Plaintiff contends that Section 25.5's purpose is to define the qualities of gas that are deemed acceptable and unacceptable, and therefore it is not meant to limit liability. ECF No. 8 at 15. As for Section 22, Plaintiff argues that this section merely delineates who possesses and controls gas at various points along the transmission and distribution chain. ECF No. 15 at 4. As such, Plaintiff argues that the section is not an unambiguous bar to liability. *Id.*

In short, the parties offer competing interpretations of the relevant provisions. At this point in the litigation, and without the benefit of a full record disclosing the parties' contemporaneous understandings of these provisions, any applicable industry customs, and the parties' course of dealings, the Court declines to make a summary ruling that the parties' contract unambiguously limits Defendant's contractual duties to the delivery point and thus renders Plaintiff's claim as one sounding in tort. Defendant is free to renew this argument after discovery. Dismissal is not warranted at this stage.

**II.   Adequacy of Plaintiff's Allegations**

Next, Defendant argues that Plaintiff's breach of contract claim fails on its face because the terms governing Plaintiff's and Defendant's business relationship explicitly preclude Plaintiff from bringing suit against Defendant for any alleged issues regarding the quality of gas transported from Defendant to Plaintiff. ECF No. 3-1 at 10. It cites to Section 25.1 of the FERC Tariff to support this argument. Section 25.1 reads:

> General Requirement. Natural gas delivered to [Defendant] and redelivered to [Plaintiff] hereunder shall at all times conform to the quality provisions set forth in this Section. [Defendant] shall not be required to receive gas from [Plaintiff] or for [Plaintiff's] account that does not conform to the requirements of this Section. [Plaintiff] shall indemnify [Defendant] and save it harmless from all suits, actions, regulatory proceedings, damages, costs, losses and expenses (including reasonable attorney fees) arising out of the failure of said gas to conform to such quality provisions.

ECF No. 3-5 at 266. Defendant interprets this provision to mean that Plaintiff must indemnify it for any nonconforming gas that Defendant transports to Plaintiff. ECF No. 3-1 at 11. Additionally, Defendant argues that Plaintiff has failed to state a claim because Section 25.5, quoted above, makes it liable only for damages occurring at the delivery point. *See id.* at 11–12.

Plaintiff offers competing interpretations of these provisions. *See* ECF No. 8 at 13–15. Plaintiff contends that Section 25.1 only requires Plaintiff to indemnify Defendant if Plaintiff breaches the contract by injecting gas that does not conform to the quality provisions. *Id.* at 14. As for Section 25.5, it again argues that the section's purpose is to define the qualities of gas that are deemed acceptable and unacceptable, and therefore, it is not meant to limit liability. *Id.* at 15.

For the reasons stated above, the Court is not yet in a position to conclusively interpret the relevant provisions. Defendant is free to renew this argument after discovery, but it is not a basis for dismissal at this early stage.

### III.  Standing

Finally, Defendant argues that Plaintiff lacks standing to bring this suit because the complaint "merely asserts the type of 'conclusory allegations of injury to pecuniary interest' that warrant dismissal." ECF No. 3-1 at 14. The Court need not address this argument because it is premised on case law describing the standard required to have statutory standing under the Racketeer Influenced and Corrupt Organizations Act ("RICO"). RICO standing is conferred by statute, and its requirements are more rigorous than constitutional standing. *Denney v. Deutsche Bank AG*, 443 F.3d 253, 266 (2d Cir. 2006). As the claim in this action does not arise under RICO, and Defendant makes no specific argument that Plaintiff lacks *constitutional* standing to bring its claim, dismissal is not warranted on this ground.

### CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss, ECF No. 3, is DENIED. Defendant's request for oral argument, ECF No. 13, is DENIED AS MOOT. Defendant shall file an answer to Plaintiff's complaint by March 31, 2025.

IT IS SO ORDERED.

Dated: February 28, 2025

HON. FRANK P. GERACI, JR.
United States District Judge
Western District of New York